Guy L. SMITH, Jr., Plaintiff, Appellant,

v.

MASSACHUSETTS DEPARTMENT OF
CORRECTION, et al., Defendants,
Appellees.

No. 90–1908.

United States Court of Appeals,
First Circuit.

Submitted Feb. 5, 1991.

Decided June 25, 1991.

Guy L. Smith, Jr., on brief pro se.

Nancy Ankers White, Special Asst. Atty. Gen., and Sondra M. Korman, Counsel, Massachusetts Dept. of Correction, on brief for defendants, appellees.

Before BREYER, Chief Judge, SELYA and CYR, Circuit Judges.

SELYA, Circuit Judge.

Guy Smith, a black male presently serving a lengthy sentence for armed robbery, appeals pro se from the dismissal of his civil rights complaint for failure to state a claim upon which relief might be granted. The complaint named as defendants the Massachusetts Department of Corrections (DOC), former DOC Commissioner Michael Fair, seven employees of the North Central Correctional Institution (NCCI) at Gardner (Superintendent Bender, disciplinary officer Geoffrey, internal security officers Jones and Dean, and three members of a prison disciplinary board),[1] and Massachusetts Correctional Institution (MCI) Cedar Junction Superintendent Michael Maloney. Smith sued the defendants in their individual and official capacities, claiming violations of his constitutional rights under 42 U.S.C. §§ 1983, 1985, and also asserting a variety of pendent state-law claims. Smith sought monetary damages, along with declaratory and injunctive relief.

*Background*

The complaint alleged, essentially, that while incarcerated at NCCI Gardner, Smith was "set up" by Jones and Dean, who allegedly coerced another inmate, one Paul Cloutier, falsely to accuse Smith of rape. As a result, on February 6, 1986, Smith was transferred from Gardner, a medium security facility, to maximum security at MCI Cedar Junction and placed on awaiting action status. One month later, a disciplinary report issued which charged Smith with engaging in unauthorized sexual acts anent Cloutier.[2] After disciplinary pro-

---

1. These members were not specifically identified in the original complaint. In July 1987, Smith filed an amended, verified complaint naming the disciplinary board members (Sylvain, Fegres and Beaton). As the amended complaint did not work any substantive changes, we refer to the complaint and the amended complaint interchangeably. We con-

strue the exhibits annexed to the original complaint as part of the amended complaint. *See* Fed.R.Civ.P. 10(c).

2. The report was signed by defendant Dean, and described the alleged offense as follows:

Around November 30th or December 1st, 1985 inmate Smith came to inmate Paul Clou-

ceedings, Smith was found guilty. The board recommended that he be placed in isolation for fifteen days and reclassified to a stricter category of custody. Smith's appeal and request for reconsideration were both denied. On April 9 he appeared before a classification board and was reclassified to maximum security for one year.[3] Smith was also forced to undergo a psychiatric evaluation.

The complaint further alleged that Cloutier was threatened and coerced by the officers into swearing out a criminal complaint that charged Smith with six counts of rape. Smith was arraigned on these charges on March 21, 1986. On August 22, when Smith appeared in Gardner District Court on the rape charges, Cloutier invoked his fifth amendment privilege against self-incrimination and refused to testify. On the same day, Cloutier signed an affidavit which stated that officers Jones and Dean offered to have him transferred anywhere he wanted to go if he would charge Smith with rape, while at the same time threatening to return him to the general prison population at NCCI Gardner (where he was a known informant) if he did not assist in prosecuting Smith. Cloutier swore that Smith never raped him. The criminal charges were dismissed.

Smith alleged that Jones, Dean and Superintendent Bender conspired to prosecute him maliciously on false rape charges. He also claimed that his initial transfer to Cedar Junction, the disciplinary proceedings which followed, and his criminal prosecution violated his constitutional rights.

The defendants filed a motion to dismiss or for summary judgment, supported by the affidavit of William Coalter, Acting Superintendent at NCCI Gardner, and by records of Smith's prior disciplinary infractions at Gardner.[4] On August 14, 1989, the district court entered a memorandum and order dismissing the complaint for failure to state a claim upon which relief could be granted. Smith, who was by that time represented by eminent counsel, moved for partial reconsideration of the order of dismissal and argued that the court had failed to address his malicious prosecution claim. The court endorsed the motion "denied" on August 19, 1990 and issued a memorandum and order on August 23, 1990, rejecting Smith's malicious prosecution claim under Fed.R.Civ.P. 12(b)(6). Smith filed a notice of appeal within thirty days of the court's last order.

*Appellate Jurisdiction*

We must first determine what, if anything, is properly before this court on appeal. The defendants argue that appellate jurisdiction is wholly lacking because the district court failed to enter judgment on a separate document as required by Fed.R. Civ.P. 58; or alternatively, that appellate review should be limited to the dismissal of Smith's malicious prosecution claim, because Smith's motion for reconsideration was not timely, hence, the time for filing a notice of appeal from the district court's August 14, 1989 dismissal order had expired. Therefore, the argument goes, Smith's notice of appeal should not be read to embrace an appeal from the court's August 14, 1989 order.

 The record discloses that the district court failed to enter judgment on a separate document after issuing either of the

---

tier's room. Smith told Cloutier that if he took care of him the way Cloutier had taken care of another inmate, the debt would be taken care of. Smith told Cloutier he better do the right ... thing. Cloutier, being in fear for his safety, performed oral sex on Smith. Smith told Cloutier he would put Cloutier's debts on hold if he continued to take care of Smith's sexual wants. This went on for three weeks and five other sexual acts.

3. It appears that Smith has served out this sanction, as more than one year has passed and Smith's present address is in Shirley, Massachusetts.

4. Plaintiff was allowed to amend his complaint after this motion was filed. As previously noted, *see supra* note 1, the amendment did not work any substantive changes. The district court denied plaintiff's motion to default defendants for failing to answer the amended complaint, allowing the defendants' motion to stand as their response to the amended complaint. We reject Smith's claim that the district court erred in denying his motion to default. The court's ruling was well within its discretion.

two orders in question. As the August 14, 1989 dismissal order was not followed by the entry of a judgment on a separate document, it did not become final at that time. *See Willhauck v. Halpin*, 919 F.2d 788, 793 (1st Cir.1990). Ergo, the time for filing a postjudgment motion or notice of appeal from that order did not expire; indeed, it did not begin to run.

The district court also failed to enter judgment on a separate document after issuing its second order in August 1990. Yet, unlike the district court's first memorandum and order, which did not discuss Smith's malicious prosecution claim at all, the August 23, 1990 memorandum reiterated the court's dismissal of the complaint while making specific reference to Smith's malicious prosecution claim. At that point, it was obvious that nothing further needed to be done by the lower court to end the matter, save for entering judgment in accordance with Fed.R.Civ.P. 58.

■ The requirements of Fed.R.Civ.P. 58 are to be applied mechanically *unless* both parties waive the requirement and neither party would be prejudiced by the lack of a separate document. *See Wang Laboratories, Inc. v. Applied Computer Sciences, Inc.*, 926 F.2d 92, 96 (1st Cir. 1991). Neither party objected to the absence of a separate document below, and neither has been prejudiced by the absence of a judgment on a separate document. Both the Supreme Court and this court have repeatedly stressed that Rule 58's separate document requirement "should always be interpreted 'to prevent loss of the right to appeal, not to facilitate loss.'" *Willhauck*, 919 F.2d at 792, *quoting Bankers Trust Co. v. Mallis*, 435 U.S. 381, 386, 98 S.Ct. 1117, 1121, 55 L.Ed.2d 357 (1978). Where it is clear that the court's August 23, 1990 order represented the final decision in the case, the order was entered on the docket, and neither party seasonably objected to the absence of judgment on a separate document below, we deem the parties to have waived the requirements of Rule 58. *Cf., e.g., Mallis*, 435 U.S. at 388–89, 98 S.Ct. at 1121. We will not needlessly "force the parties round and round the mulberry bush," only to return another day. *Jusino v. Zayas*, 875 F.2d 986, 989–90 (1st Cir.1989). Accordingly, we deem our jurisdiction over all issues to have been established by the parties' waiver of the separate document requirement.

### Standard of Review

■ We take the opportunity to note at this juncture that, while the district court's orders utilized the familiar vocabulary of Fed.R.Civ.P. 12(b)(6), the motion before the court was cast in the alternative. The substance of the court's 1989 order indicates that it relied on the defendants' documentary submissions in resolving plaintiff's claim that his initial transfer to Cedar Junction violated his constitutional rights. Because the district court went beyond the complaint, we shall treat the motion as one for summary judgment. *See Farley v. Henderson*, 883 F.2d 709, 711 (9th Cir.1989) (per curiam). Moreover, because Smith's complaint was verified and supplemented by numerous exhibits, including an affidavit from Cloutier, we treat those materials, to the extent they recite facts shown to be consistent with Fed.R.Civ.P. 56(e), as part of the summary judgment record. *See Sheinkopf v. Stone*, 927 F.2d 1259, 1262–63 (1st Cir.1991).

### The Transfer

In 1984, while incarcerated at MCI Cedar Junction, Smith entered into a classification contract with DOC which provided for Smith's transfer to successively less inhibiting facilities upon his successful participation in a substance abuse program, job assignment and training, and group therapy. Smith was to be shunted to NCCI Gardner in 1984, to a minimum security facility in 1988, and to a pre-release center in 1992. The classification contract also provided that Smith was subject to random urinalysis and that the receipt of one positive screening "may result" in renegotiation of the contract, while two positive tests may result in its termination. The same stipulation governed Smith's receipt of major disciplinary reports. In addition,

the contract contained the following provisions:

h. Whenever, in the opinion of the Commissioner, an emergency exists which requires suspension of all or part of any contract, the Commissioner may authorize such suspension.

*Standard Movement Chronology for Contract Renegotiation*

In the event that an inmate escapes or is returned to higher custody, a renegotiation of the classification contract shall be required.

Following either of these incidents, the following tables shall be utilized to determine the contract consequences in terms of the minimum length of time required at the particular security level(s).[5]

Pursuant to this contract, Smith was transferred from Cedar Junction to Gardner on November 1, 1984.

According to the defendants' submissions, Smith received six major disciplinary reports between February and November, 1985. Four of these involved possession of marijuana. Smith either pled guilty to, or was found guilty of, all such charges. In November 1985, the disciplinary board recommended that he be transferred to more restrictive custody. On January 20, 1986, presumably as a result of this recommendation, Smith appeared before a classification board. He requested a lateral transfer to another medium security facility, complaining that he feared that officers Jones and Dean would "set him up" because they had continually harassed him with false drug-trafficking accusations while he was at Gardner. At some unspecified time, Smith complained to Superintendent Bend-

er about the officers' conduct. On February 5, 1986, Smith told Jones of his complaint to Bender. Jones allegedly responded, "Your [sic] out of here." Five hours later, Smith was brought to the security office where he was confronted by Dean, Jones, and a state trooper (Bennett). Bennett informed Smith that Cloutier had signed a statement charging Smith with rape. Smith denied the charges. He alleged that Jones and Dean had pressured Cloutier into lying to get Smith removed from Gardner. The following morning, Smith and Charles Sellars, another inmate whom Cloutier charged with rape, were transferred to Cedar Junction. Smith alleged that he did not receive either a disciplinary report or a pre-transfer hearing. Upon arriving at Cedar Junction, Smith was placed on awaiting action status.

The defendants rely heavily on Coalter's affidavit. Coalter stated that Smith was transferred to Cedar Junction per order of Superintendent Bender pursuant to 103 C.M.R. § 420.13(2)(b), because Smith was considered to be an immediate threat to the health and safety of others as a result of the rape charge.[6] At that time, Coalter said, Smith was already in violation of his classification contract as he had been found guilty of six major disciplinary infractions. Moreover, Coalter stated that it was the practice at NCCI Gardner to transfer inmates considered to be an immediate threat to health and safety because the prison was experiencing a shortage of lockup cells. For this same reason, plaintiff's disciplinary hearing was eventually held at MCI Cedar Junction.[7]

5. The contract specified certain placement consequences that would attend an inmate's escape or return to more restrictive custody as a result of the inmate's inability to function in a less secure setting. One year of maximum security confinement was specified as the placement consequence when an inmate was returned from a medium security facility and the return was because of behavior of a violent or assaultive nature.

6. This regulation provided, in relevant part,
Where the Deputy Commissioner for Classification and Treatment or the Superintendent or his designee determines at any time prior

to or during [a proceeding for reclassification to a higher custody status] that there is an immediate threat to the health or safety of the resident or to others, the resident may be placed in an awaiting action status until there is a final decision about a transfer.
*See* 103 C.M.R. § 420.13(2)(b) (1978).

7. On March 5, 1986, Smith received a disciplinary report charging him with engaging in unauthorized sexual acts with Cloutier. His disciplinary hearing was originally scheduled for March 13. The hearing was continued at Smith's request and held on March 27.

Smith alleged that his transfer from Gardner to Cedar Junction violated his constitutional right to due process because he had not been given formal notice of the charges against him and a hearing before his transfer. He claims that, under the terms of his contract and the DOC's classification regulations, he could not be transferred unless he received notice, a hearing, and an impartial adjudication that he was guilty of the rape charges. He further claims that he was entitled to an appeal from such a finding and to a subsequent classification hearing before his transfer could be accomplished without violating his right to due process.

The district court ruled that these facts did not state a viable claim because *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976), established that Smith had no liberty interest in being assigned to a particular institution[8]; and moreover, since Smith had violated his classification contract as early as March 1985, any interest Smith had under its terms had been extinguished.

It is true that the Due Process Clause does not prohibit intrastate prison transfers absent prior notice to the inmate and a pretransfer hearing. *Meachum v. Fano*, 427 U.S. at 225, 96 S.Ct. at 2538. Nevertheless, liberty interests may be created by state law and thus acquire the protection of the Fourteenth Amendment. *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). In *Lanier v. Fair*, 876 F.2d 243, 248 (1st Cir. 1989), we held that the Massachusetts procedures governing inmate transfers from halfway houses together with an inmate's "'community release agreement'" gave the inmate a protected liberty interest in remaining at a halfway house. While the DOC's regulations alone did not contain substantive predicates governing an inmate's transfer, the program guidelines governing the operation of community treatment centers indicated that a return to more restrictive custody could only occur when a convict had violated certain regulations. Similarly, the community release agreement signed by Lanier gave inmates "a legitimate expectation that they will be returned only for violating the established program rules." *Id.*

*Stokes v. Fair*, 795 F.2d 235, 237–38 (1st Cir.1986), is cut from similar, but not identical, cloth. There, we held that the DOC's regulations governing the placement of inmates on awaiting action status, 103 C.M.R. §§ 420.13(2)(b), 430.19 (1978), gave inmates a liberty interest and a right to procedural due process in the initiation and continuation of awaiting action status.[9] These regulations were in effect at the time of Smith's initial transfer to Cedar

---

**8.** Massachusetts General Laws c. 127, §§ 20 and 97 have remained essentially unchanged since the Supreme Court decided in *Meachum* that these statutes did not create a liberty interest. Section 97 provides, in relevant part, that "[t]he commissioner may transfer any sentenced prisoner from one correctional institution of the commonwealth to another.... Prisoners so removed shall be subject to the terms of their original sentences and to the provisions of law governing parole from the correctional institutions of the commonwealth."

**9.** 103 C.M.R. § 420.13(2)(b) is set out in note 6, *supra*. Section 430.19 provides:

*Placement in Detention in Awaiting Action Status*

(1) The superintendent or his designee may authorize the placement of an inmate in awaiting action status pending:

(a) A hearing on a disciplinary offense by the inmate

(b) An investigation of a possible disciplinary offense by the inmate

(c) A transfer or a reclassification of the inmate to higher custody status, or

(d) Imposition of isolation time sanction on the inmate when the inmate's continued presence in the general population poses a serious threat to persons, property, or the security of the institution.

(2) The superintendent shall designate such person or persons as he deems appropriate to review the status of inmates housed in detention in awaiting action on a weekly basis. An inmate shall be released from detention when the reasons for his initial placement cease to exist or when his return to general population no longer poses a serious threat to persons, property, or the security of the institution or when he is no longer in the status specified in any one of 103 CMR 430.19(1)(a) through 430.19(1)(d).

Junction on February 6, 1986.[10]

Smith's case is somewhat of a hybrid. Like Lanier, he claims a liberty interest derived from the DOC's classification regulations and from his classification contract. Like Stokes, Smith initially was detained at Cedar Junction on awaiting action status. He thus had a liberty interest according him the right to due process in the initiation and continuation of that status. *See Stokes*, 795 F.2d at 237–38. Be that as it may, Smith falls short of establishing a due process violation under either theory.

■ The DOC regulations governing transfers to higher custody generally set forth procedures to be followed when an inmate is to be reclassified. *See generally* 103 C.M.R. § 430.13 (1978). While these regulations provide that the prisoner shall receive notice and an opportunity to testify at a classification meeting, they do not contain any substantive predicates limiting the discretion of prison officials to reclassify an inmate. Accordingly, they cannot be said to create a cognizable liberty interest. *Cf. Lanier*, 876 F.2d at 247. Similarly, Smith's classification contract was phrased in discretionary terms and contained no language purporting to limit the commissioner's statutory discretion in ordering transfers. Moreover, Smith conceded below that his prior disciplinary violations breached the contract. Accordingly, any interest he may have had thereunder was extinguished.[11]

■ Smith has not alleged, nor do the papers attached to his complaint suggest, that he was denied the procedural protections required by the awaiting action status regulations.[12] Moreover, the uncontradicted evidence established that Superintendent Bender considered Smith to pose an immediate threat to institutional safety. Thus, one of the requisite substantive predicates for placing an inmate on awaiting action status was present. For these reasons, we discern no due process violations in Smith's initial transfer and detention at Cedar Junction on awaiting action status. Insofar as the complaint challenged Smith's transfer, it was appropriately dismissed.

## The Disciplinary Proceedings

The undisputed facts concerning these allegations are as follows. After being served with the disciplinary report and a request for witnesses/representation form, Smith asked that Dean and Cloutier be present at his disciplinary hearing. On

10. Our decision in *Stokes* was issued on July 16, 1986. On appeal, the defendants argue that they are entitled to qualified immunity on Smith's transfer claim, since they could not have known that the regulations cited in *Stokes* created a liberty interest before that decision was issued. Alternatively, they argue that *Stokes* was effectively overruled by *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). These arguments were not raised below. Hence, we decline to consider them. *See Clauson v. Smith*, 823 F.2d 660, 666 (1st Cir.1987) (arguments not seasonably advanced below cannot be raised for the first time on appeal).

11. Smith also argues that a liberty interest derives from certain disciplinary regulations which set forth procedural time limits within which DOC employees should process disciplinary reports. *See* 103 C.M.R. §§ 430.08(2), 430.-11(1). As these regulations embody only procedural time limits, they do not create the necessary liberty interest. *See Parenti v. Ponte*, 727 F.2d 21, 24 (1st Cir.1984); *cf. Maldonado Santiago v. Velazquez Garcia*, 821 F.2d 822, 827 (1st Cir.1987) (Puerto Rico regulation governing emergency transfers created liberty interest protected by due process).

12. *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), established that where a state creates a liberty interest in administrative segregation, an inmate is entitled to "some notice of the charges against him and an opportunity to present his view to the prison official charged with deciding whether to transfer him to administrative segregation." *Id.* at 476, 103 S.Ct. at 873. "Prison officials must [then] engage in some sort of periodic review" of administrative confinement. *Id.* at 477 n. 2, 103 S.Ct. at 867 n. 2. While Smith argues that the notice he received was insufficient because he was not served with a formal disciplinary report until one month after he was transferred, he clearly received oral notice of the charges against him as a result of his meeting with Bennett, Jones and Dean. Moreover, Smith had an opportunity to present his view on the matter by letter to Superintendent Bender. Bender's response indicates that he was aware of Smith's position and, in effect, determined that Smith's awaiting action status should continue while Smith remained under investigation.

March 6, 1986, Smith filed a motion for discovery with Bender and disciplinary officer Geoffrey. Smith sought, inter alia, the DSU logbook for the period December 1, 1985–February 6, 1986 to show that Cloutier was in protective custody and, therefore, at least arguably inaccessible to him during the time the rapes allegedly happened.[13] Smith subsequently filed a motion to dismiss on the ground that the prison officials had failed to provide him with discovery. He also asserted that the vagueness of the disciplinary report prevented him from preparing a defense to the charge. Neither Bender nor Geoffrey responded to Smith's motions.

On March 27, 1986, Smith appeared at Cedar Junction before the disciplinary board. Chairman Sylvain read a signed, unsworn statement of the alleged victim, Cloutier.[14] The disciplinary hearing record reflects that an incident report by Dr. Harris, which disclosed no physical evidence of rape, and two letters from officer Dean to Superintendent Bender, which are not in the record before us, were read by all board members and by Smith. Smith denied the charges and asked to call inmate Sellars to refute Cloutier's allegation that Smith had supplied Sellars with drugs. Sylvain denied that request. Smith alleged that Jones and Dean had a vendetta against him and used Cloutier to "get at him." Smith asked Dean whether he believed that he, Smith, had raped Cloutier. Chairman Sylvain instructed Dean not to answer the question. Smith argued that Cloutier accused him so that Cloutier could finagle a move to more hospitable environs.

Smith alleged that the defendants knowingly violated his right to due process by (1) denying him discovery and access to exculpatory evidence, (2) denying his request to cross-examine Cloutier at his disciplinary hearing, (3) denying his request to call Sellars as a witness, and (4) denying him the right to cross-examine Dean on his beliefs as to Smith's guilt.[15]

Under *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), a prisoner facing a disciplinary hearing that may result in the loss of a liberty interest must receive "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and to present documentary evidence in his defense; (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S.

---

**13.** Smith's motion for discovery also sought statements, medical reports, the prison doctor's logbook, copies of other reports of sexual incidents involving Cloutier, and specification of the days, times, and places of the alleged offenses. Smith had previously requested much the same information by letter to Bender, which went unanswered.

**14.** This read in relevant part:

I owed ... money at the time, so it became difficult to think, and then Guy Smith approached me and said that he heard that I was having problems, and that he could stop all of them, as he was Charles Sellars supplier; [h]e kept coming offering me drugs and money. I was scared with no place to hide, so I did have anal and oral sex with Guy Smith and so the pressure was relieved somewhat.... [H]e knew he had me over a barrel. He said if I don't continue to have sex with him I would get f—— up ... I am embarrassed to tell this but I feel I should so it does not happen to someone else becau[s]e it is a disgrace.

In the remaining portions of this statement Cloutier accused another inmate, Sellars, of extorting sex from him. The statement further reflects that officer Dean informed Cloutier that this information would be relayed to the state police, and that Cloutier indicated that he was willing to testify in court against Smith and Sellars, but requested that he be moved to a house of correction for protection from other inmates. Cloutier later averred that he was transferred to the Worcester House of Corrections after Jones and Dean "force[d]" him to swear out a criminal complaint against Smith.

**15.** Smith also alleged that the disciplinary board had no jurisdiction outside NCCI Gardner and that his right to due process was violated by convening the hearing at Cedar Junction. The claim is specious and was properly dismissed. As this claim was the only one against Superintendent Maloney, he was properly dismissed as a defendant. Smith also alleged that the disciplinary report charging him with Cloutier's rape was not timely issued under the procedural guidelines set forth in 103 C.M.R. §§ 430.08(2) and 430.11 (1978). Even if this were so, which we do not imply, there was no due process violation.

445, 454, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985), citing *Wolff*, 418 U.S. at 563–67, 94 S.Ct. at 2978. Even though Smith did not have a liberty interest in remaining at Gardner, he was entitled to these procedural safeguards because he risked the loss of liberty entailed in isolation time, a sanction which he ultimately received. *See Parenti v. Ponte*, 727 F.2d 21, 25 (1st Cir.1984). The district court dismissed Smith's claims on the ground that prisoners have *no* rights to obtain exculpatory evidence, to conduct discovery, or to confront witnesses in prison disciplinary proceedings.[16] We believe the court went too far.

■ *Wolff* and its progeny make clear that the rights of prisoners facing disciplinary proceedings are limited by the competing concerns of maintaining institutional safety and other correctional goals. "Prison officials must have the necessary discretion to keep [a disciplinary hearing] within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Wolff*, 418 U.S. at 566, 94 S.Ct. at 2979. While the Court held that confrontation and cross-examination are not constitutionally required in prison disciplinary proceedings, the Court further acknowledged that "a narrow range of cases" may exist "where interest-balancing may well dictate cross-examination...." *Id.* at 568–69, 94 S.Ct. at 2981. The discretion of prison officials in such matters is undeniably broad, but it is still subject to judicial review for abuse. Thus, in *Hurney v. Carver*, 602 F.2d 993 (1st Cir.1979), we held that an inmate claiming a violation of procedural due process in a disciplinary hearing must allege that his requests to call witnesses or submit written statements "were denied for reasons not having to do with institutional security or correctional

goals, and that the prison officials" who denied such requests "clearly abused their considerable discretion in such matters." *Id.* at 995. Such "allegations must be backed up with enough supportive facts to outline the elements of the pleader's claim." *Id.*

■ In *Ponte v. Real*, 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985), the Court, while reiterating *Wolff*'s holding that due process does not require an administrative disciplinary board to include in the record of a disciplinary hearing a statement of reasons for the denial of an inmate's request to call witnesses, extended *Wolff* slightly by holding that,

> prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, but ... they may do so either by making the explanation a part of the 'administrative record' in the disciplinary hearing, or by presenting testimony in court if the deprivation of a 'liberty' interest is challenged because of that claimed defect in the hearing. In other words, the prison officials may choose to explain their decision at the hearing, or they may choose to explain it 'later.' ... [S]o long as the reasons are logically related to 'institutional safety or correctional goals,' the explanation should meet the due process requirements as outlined in *Wolff*.

*Id.* 471 U.S. at 497, 105 S.Ct. at 2196. The Court expressly declined to place on the inmate the burden of proving that the denial of a request to call witnesses was arbitrary or capricious, because the reasons why prison officials refused to call witnesses requested by the inmate "are almost by definition not available to the inmate." *Id.* at 499, 105 S.Ct. at 2197. In sum, *Ponte* "clarifies that the burden of persuasion as to the existence and sufficiency of such institutional concerns [justifying the denial

---

16. We note that the district judge observed in both his August 14, 1989 and August 23, 1990 memoranda that Smith's disciplinary hearing did not implicate a liberty interest protected by the Due Process Clause. The fact that Smith's initial transfer did not violate a liberty interest did not necessarily mean that the disciplinary

proceedings which followed could not impinge on a liberty interest. Where Smith was exposed to the sanction of isolation time, he was entitled to certain due process rights in the course of his disciplinary proceedings. *See Wolff*, 418 U.S. at 563–67, 94 S.Ct. at 2978–80.

of an inmate's request to call witnesses] is borne by the prison officials, not by the prisoners." *Grandison v. Cuyler*, 774 F.2d 598, 604 (3d Cir.1985).

 These principles apply to the alleged due process violations anent Smith's disciplinary proceedings. The violations generally fall into two categories: a denial of an opportunity to question witnesses, including the purported victim, Cloutier, and a denial of potentially exculpatory documents, *e.g.*, the DSU logbook, which allegedly would have shown that Cloutier was in protective custody during the time the rapes allegedly happened. No reasons appear in the record for the denial of Smith's request to call Cloutier. While the defendants argue on appeal that this request was "obviously" denied to insure Cloutier's safety, it was the officials' burden to come forward with evidence of the reasons for such denials. Yet, they failed to submit any affidavits or other evidence on this issue. We decline to speculate, as the defendants invite us to do, particularly where it appears that, at the time of the disciplinary hearing, Smith and Cloutier were housed in separate prisons, and any threat of reprisal was seemingly manageable.

We rule, therefore, that the defendants failed to satisfy their burden under *Ponte* and under Fed.R.Civ.P. 56. *See Grandison v. Cuyler*, 774 F.2d at 604 (reversing summary judgment for defendant prison officials where record did not reflect reasons why inmate's request to call another inmate as a witness was denied); *see also Bostic v. Carlson*, 884 F.2d 1267, 1273 (9th Cir.1989) ("The burden of proving adequate justification for denial of a request to present witnesses rests with the prison officials."); *McFarland v. Cassady*, 779 F.2d 1426, 1429 (9th Cir.1986); *cf. Freeman v. Rideout*, 808 F.2d 949, 953–54 (2d Cir. 1986), *reh'g denied en banc*, 826 F.2d 194 (1987), *cert. denied*, 485 U.S. 982, 108 S.Ct.

1273, 99 L.Ed.2d 484 (1988) (where prison superintendent testified that inmate/victim who was assaulted by plaintiff did not testify at plaintiff's disciplinary hearing to protect victim from retaliation, disciplinary hearing did not violate procedural due process).[17]

 On the other hand, where the disciplinary hearing record reflects a basis for the denial of Smith's request to call Sellars and the limitation of his cross-examination of defendant Dean, we discern no procedural due process violations in these rulings. The hearing record discloses that Smith's request to call Sellars was denied as tardy. Smith conceded that his request was untimely below, but argued that he did not know that Cloutier's statement implicated him and Sellars until he heard it at the disciplinary hearing. We think that the denial of a request to call a witness on the ground that the request is untimely is well within the disciplinary board's discretion. At any rate, Smith does not press this ground on appeal.

 Similarly, while the hearing record does not purport to transcribe Smith's questioning of Dean, it nonetheless discloses that Dean was questioned by Smith, and that Smith availed himself of the opportunity to present his defense (*i.e.*, that Dean and others framed him) to the board. We do not read *Ponte* to require an explanation of every curtailment of an inmate's questioning of a witness during a disciplinary hearing. On this record, chairman Sylvain did not abuse his discretion in blocking Smith's question as to whether Dean believed Smith to be guilty. Dean's personal belief was irrelevant to a resolution of the disciplinary charge.

Finally, we pause over whether Smith's right to due process was violated by the denial of his motion for discovery. Smith

---

**17.** We note that in *Ponte,* the plaintiff requested as witnesses inmates who had not accused Ponte of any wrongdoing. Smith's case may be distinguished from *Ponte* because the primary witness Smith sought to question was the complaining victim. Ordinarily, the risk of retaliation justifying the denial of a request to question an inmate/victim might be deemed obvious. Yet, Smith's allegation that Cloutier was transferred from Gardner in return for his false complaint was uncontested on the record below. Even had Smith been found not guilty, it appears he would not have had access to Cloutier to work his revenge. On this record, we think *Ponte* calls for some explanation of the denial of Smith's request to confront Cloutier.

sought access to the DSU logbook to show that Cloutier was inaccessible at the time of the alleged offenses. Superficially, at least, this evidence appears particularly important to Smith's defense. Indeed, it could well have been dispositive of a critical issue. In these circumstances, we think this request for discovery stands on the same footing as a request to call witnesses.[18] We explain briefly.

In *Wolff,* the Supreme Court indicated that an inmate's right to call witnesses and to present documentary evidence in a disciplinary proceeding stood on the same footing, in that both were limitable, in the discretion of prison officials, in order to further institutional safety or correctional goals. *See Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979; *see also Ponte,* 471 U.S. at 495, 105 S.Ct. at 2195. If an inmate has a circumscribed right to present documentary evidence, logic dictates that he must also have some possible means for obtaining it. While *Wolff* does not accord an inmate a right to pre-hearing discovery,[19] we think that, consistent with the rationale of *Ponte,* when an inmate seeks relevant and important documents central to the construction of a defense, and his requests are repeatedly denied, an explanation of the reasons for the denial should be furnished. At some time, the reasons for the denial of such a request must be made apparent. Here, the defendants offered no reasons for the denial of Smith's motion for discovery of documentary evidence either at the time of the disciplinary hearing or in connection with their Rule 56 motion. Thus, summary judgment with respect to this claim was inappropriate.

To recapitulate, the record establishes that no procedural due process violations attended the denial of Smith's request to call Sellars as a witness or the limitation of

his cross-examination of Dean. But, because the record does not indicate any reasons for the denial of either the request to call Cloutier as a witness or the motion for discovery of seemingly relevant documentary evidence, summary judgment on these claims was not appropriate. *See, e.g., Young v. Kann,* 926 F.2d 1396, 1400–02 (3d Cir.1991) (allegations that prison official refused to produce allegedly incriminating letter absent valid security reason stated viable claim for violation of inmate's due process rights).

*Malicious Prosecution*

Smith averred that the defendants Jones, Dean and Bender conspired to prosecute him maliciously "through the agency of Paul Cloutier." His allegation was supported by Cloutier's affidavit, which directly accused Jones and Dean of threatening and coercing him to accuse Smith falsely. Smith argued that Jones and Dean were motivated by a desire for retaliation—presumably, for Smith's complaint about them to Bender.

The district judge, relying in part on *Morreale v. De Zotell,* 10 Mass. App.Ct. 281, 282–83, 406 N.E.2d 1311 (1980), ruled that Smith failed to allege facts showing that the *disciplinary board* acted without probable cause in finding him guilty. While true enough, in that the disciplinary board had only Cloutier's original, unsworn statement to Dean, and not his recantation, this does not compel the conclusion that the complaint failed to state a claim as to defendants Jones and Dean, the alleged conspirators.[20] That Cloutier, and not Jones or Dean, signed the criminal complaint does not defeat Smith's malicious prosecution claim under Massachusetts law. *See* Nolan and Sartorio, *Tort Law,* § 79 (1989) ("A person who brings about

---

**18.** The relevance of the other items sought by Smith's discovery request is less apparent. We do not think that the denial of discovery, as to those items, rose to a level of constitutional magnitude. At any rate, Smith's brief on appeal is bereft of any developed argumentation to the contrary.

**19.** We note in this respect that, under the applicable regulations, "[t]he inmate shall be allowed

to present relevant, non-cumulative documentary evidence in his defense." 103 C.M.R. § 430.14(7) (1978).

**20.** Smith offered no evidence implicating Bender in the alleged conspiracy. Accordingly, dismissal of this claim as to Bender was indubitably proper.

the arrest or indictment of the plaintiff has initiated criminal proceedings to the same extent as one who has signed a criminal complaint.") Moreover, the judge erred in limiting his consideration of this section 1983 claim to Massachusetts law. Our reasoning follows.

"All federal claims for malicious prosecution are borrowed from the common law tort ... [which] imposes liability on a private person who institutes criminal proceedings against an innocent person without probable cause for an improper purpose. The federal claim under [42 U.S.C.] section 1983 for malicious prosecution differs from the state civil suit in that it requires that state officials acting 'under color of law' institute the criminal proceedings against the plaintiff *and thereby deprive him of rights secured under the Constitution."* *Torres v. Superintendent of Police,* 893 F.2d 404, 409 (1st Cir.1990) (emphasis supplied). Although we have not had occasion to apply this standard in the context of a convicted inmate's claim for malicious prosecution by prison officials alleged to have knowingly procured false evidence implicating the inmate in a crime, *Torres* nevertheless guides our journey.

"Malicious prosecution does not *per se* abridge rights secured by the Constitution." *Morales v. Ramirez,* 906 F.2d 784, 788 (1st Cir.1990). In articulating the elements of a malicious prosecution claim under 42 U.S.C. § 1983, we have held that "the complaint must assert that the malicious conduct was so egregious that it violated substantive or procedural due process rights under the Fourteenth Amendment." *Torres,* 893 F.2d at 409. "[F]or substantive due process purposes, the alleged malicious prosecution must be conscience shocking." *Id.* at 410. "For procedural due process purposes ... the plaintiff usually must show the alleged conduct deprived him of liberty by a distortion and

corruption of the processes of law, *i.e.,* corruption of witnesses, falsification of evidence, or some other egregious conduct resulting in the denial of a fair trial.... In addition, the plaintiff must show there was no adequate state postdeprivation remedy available to rectify the harm. If state tort law furnishes an adequate remedy, the plaintiff does not have a Section 1983 cause of action merely because the defendant is a government official." *Id.* (citations omitted).

 Fairly read, the instant complaint attempts to state a claim for malicious prosecution by the distortion and corruption of the processes of law (specifically, the corruption of the complaining witness/victim Cloutier, resulting in the loss of liberty entailed in temporary detention in isolation). Under *Torres,* this sounds in the nature of a procedural due process claim. Smith's complaint did not allege, however, that there was no adequate state law remedy available to him. Furthermore, there is no reason to think that an action for the common law tort of malicious prosecution, which is recognized in Massachusetts, would not have been an adequate remedy in these circumstances. Hence, under *Torres,* no section 1983 claim would lie. *See Torres,* 893 F.2d at 410. On that basis, we hold that Smith's malicious prosecution claim was properly dismissed.[21]

### Conclusion

The district court's orders dismissing Smith's transfer and malicious prosecution claims are affirmed. The order dismissing Smith's claims for alleged due process violations in the course of his disciplinary proceedings is vacated. The case is remanded for further proceedings consistent with this

---

**21.** The appellant, represented below by learned counsel, neither alleged nor argued that the defendants' contributions toward his prosecution worked a constitutional violation along the substantive due process axis. That being so, we take no view of whether or not defendants' behavior, seen in the light least favorable to them, might be characterizable as conscience-

shocking. *See Clauson v. Smith,* 823 F.2d 660, 666 (1st Cir.1987) (arguments not made below cannot ordinarily be raised for the first time on appeal); *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.) (issues not briefed are waived), *cert. denied,* —— U.S. ——, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

opinion. All parties shall bear their own costs.[22]

*Affirmed in part; vacated in part; remanded. No costs.*

---

**22.** While the district court did not expressly refer to Smith's pendent state-law claims, we presume that these were dismissed with prejudice when it dismissed the section 1983 claims. *See Velazquez–Rivera v. Sea–Land Service, Inc.,* 920 F.2d 1072, 1075 n. 5 (1st Cir.1990). As to defendants remaining in the case on remand, that dismissal should be vacated for the time being and the state-law claims reconsidered in light of this opinion.