Dayutis v. Powell                    CV-93-257-B    05/02/94
                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW HAMPSHIRE


Dean Dayutis

     v.                                    Civ. No. C-93-257-B

Ronald R. Powell, Commissioner
of New Hampshire Dept. of
Corrections


                         O R D E R


     Dean Dayutis brings this petition for habeas corpus relief

pursuant to 28 U.S.C. § 2254.  He alleges that, in adjudicating

him guilty of a major disciplinary violation and sanctioning him

with loss of forty days of accumulated good time credits, fifteen

days punitive segregation, and reclassification to a higher

custody status, the New Hampshire State Prison's Major

Disciplinary Board violated several of his federal constitutional

rights.[1]  Specifically, he claims that, as applied to him, the

prison's disciplinary procedures are impermissible ex post facto

_____

     [1]Dayutis also claims violations of rights guaranteed him by
various provisions of the New Hampshire Constitution.  To the
extent that these provisions do not create liberty interests
protectable under the Due Process clause, see Section II.B.,
supra, they fail to provide a basis for habeas corpus relief.
See 28 U.S.C. § 2254(a) (state prisoner's application for writ
may only be entertained on ground that he is in custody in
violation of the "Constitution or laws or treaties of the United
States.")

laws; that these procedures did not comport with his Fourteenth Amendment right to procedural due process; and that, by sanctioning him with a combination of punitive segregation and loss of good time credits for a single disciplinary violation, the Board contravened both the Fifth Amendment's Double Jeopardy Clause and the Eighth Amendment's prohibition on cruel and unusual punishment. Dayutis seeks injunctive relief expunging the major disciplinary violation from his prison record, restoring his lost good time credits, and enjoining the State from further alleged infringements of his constitutional rights.

## I. FACTS[2]

In November 1983, Dayutis was convicted of second degree murder and sentenced to eighteen to forty years imprisonment. In 1972, when Dayutis committed the crime, the New Hampshire Department of Corrections had no written regulations governing inmate conduct. At least since the early 1980s, however, the Department of Corrections has had in place a comprehensive set of

---

[2]**The facts set out in this section are derived from Dayutis' petition and the documents referenced therein (i.e., the written notice of Dayutis' scheduled hearing before the Board, the disciplinary report that prompted the hearing, and the Board's written decision finding Dayutis guilty of a major disciplinary violation).**

regulations and procedures that established standards of inmate conduct, and adjudicative procedures and appropriate punishments for their violation. These regulations are set out in the N.H. Dept. of Corrections' Manual for Guidance of Inmates (1986 ed.).[3]

On November 2, 1988, a prison officer provided Dayutis with written notice that he was scheduled to appear before the prison's Major Disciplinary Board because he had violated two disciplinary rules. At the same time, Dayutis was given a copy of the underlying disciplinary report, which cited him for swearing at Prison Officer Woodall and calling her a "dyke". See Inmate's Manual Rule 12, § V.D. at 49 (prohibiting inmate's use of abusive, profane or obscene language); Rule 14, § V.D. at 49 (prohibiting insubordination, including cursing at and showing disrespect for a staff member). The report also recommended that the incident be processed as a major disciplinary violation. See id. at 48 (prison officials have discretion in determining whether a specific incident warrants a major hearing, a minor hearing or a trial in court).

At the hearing, Dayutis pled "not guilty". Officer Woodall then testified that Dayutis approached her on his way up the

---

[3]I cite the 1986 edition because it was the edition in force when Dayutis committed the disciplinary violations at issue here.

3

stairs to the prison infirmary and stated "Not another fucking dyke," and then that "you bitches are worse than shitpaper." Officer Woodall also testified that Officer Dewees, who had witnessed the altercation, would similarly describe the incident if called. The Board refused to allow Dayutis to cross-examine Officer Woodall. Dayutis then testified on his own behalf, stating that he and a fellow inmate, Tim Robbins, had been discussing another woman working at the prison, and that Woodall must have overheard the conversation and mistakenly assumed that the two inmates were referring to her. Dayutis called Robbins, who corroborated Dayutis' story.

After the hearing, the Board issued a written decision finding Dayutis guilty of violating Prison Disciplinary Rules 12 and 14. The decision summarized the testimony offered by both sides and concluded that Dayutis was guilty of a major disciplinary violation because he "did use foul language by admission." The Board then set out Dayutis' punishment: 15 days punitive segregation (suspended for 50 days); loss of forty days accumulated good time credits; and recommended reclassification to a higher custody status (suspended for 90 days). The Board stated that Dayutis' past disciplinary history warranted the loss

4

of good time credits.[4]  Dayutis appealed the Board's decision to the Commissioner, who denied it on the merits.

## II.    PROCEDURAL HISTORY

Dayutis filed his habeas corpus petition with this court in May 1993.  The State moved to dismiss the petition on the grounds that (1) he failed to exhaust state remedies; (2) his claims are barred by the doctrines of res judicata and collateral estoppel; and (3) that he does not have a constitutionally protected liberty interest in his accumulated good time credits.  I disposed of grounds (1) and (2) in oral orders.  On February 11, 1994, I also directed the State to file, and Dayutis to respond to, a supplemental brief addressing the merits of Dayutis' claims.  In their brief, the State elected not to pursue ground (3) above.  I therefore denied the State's motion to dismiss on March 16, 1994.

Dayutis failed to comply with my February 11, 1994 order requiring him to file a memorandum responding to the State's

---

[4]Dayutis alleges that this past disciplinary history consisted of an October 24 decision finding him guilty of three minor disciplinary violations that occurred on October 13, and an October 31 guilty admission for a minor disciplinary violation that occurred on October 19.

supplemental brief.  Instead, he filed a "notice" alleging that he has been unable to prosecute his case "due to led [sic] poisoning, and drug and alcohol abuse in the past, [he] is incapable of making spontaneous responses of reliable, accurate and calculated quality .... [and that] led [sic] poisoning, drugs and alcohol have brought petitioner to near death on multiple occasions, causing brain damage."  He also alleged that he has been transferred to another facility in Connecticut where his typewriter has been confiscated and "all law library requests are unanswered."  Finally, in an additional, subsequently filed objection, Dayutis alleged that the legal assistance provided him by the Connecticut Prison Association was inadequate, and that the legal library at his new facility lacks such basic legal sources as the Supreme Court Reporter, Federal Reporter and Federal Supplement.[5]  Based on the above assertions, Dayutis

---

[5]Dayutis asserts that the library's inadequacy deprives him of the means to identify the legal materials relevant to his case and provide the exact case citations required for him to obtain identified materials through the Connecticut Prison Association or through the prison's inter-library loan system.  See, e.g., Cepulonis v. Fair, 732 F.2d 1, 4 (1st Cir. 1984) (criticizing exact citation system as means of providing legal materials to prison inmates); Messere v. Fair, 752 F. Supp. 48, 50 (D. Mass. 1990) (holding similar system unconstitutional).  Dayutis, however, does not allege that he has requested basic research assistance from these sources and been denied because he was unable to supply exact citations.  See Blake v. Berman, 877 F.2d

6

requests appointment of counsel and attempts to excuse his failure to file the appropriate responsive pleadings by the deadline established in my February 11, 1994 Order.

I reject these assertions for two reasons. First, based on Dayutis' pleadings and my personal observations of him during the two hearings I have conducted thus far, I find that he is an articulate and experienced prison litigator capable of responding appropriately to the demands of this case and in no need of appointed counsel. Second, Dayutis has access to the legal resources necessary to litigate his claims. Regardless of the adequacy of the Connecticut Prison Association's assistance or of the prison's library, by court order Dayutis has been provided with the state statutes, prison regulations and federal case law relevant to the disposition of the issues addressed in this decision. He has also been provided with access to an electric

145, 147 (1st Cir. 1989) (prisoner who does not affirmatively avail himself of access alternatives has no basis for complaining of inadequacy of these alternatives). Moreover, regardless of whether, in a civil rights action, Dayutis might facially challenge the prison library's deficiencies as systematically denying prisoners' access to the courts, see, e.g., Sowell v. Vose, 941 F.2d 32, 34 (1st Cir. 1991), as I detail above, in this particular habeas corpus case Dayutis has been provided with adequate access to the legal materials relevant to this case. Cf. Corgain v. Miller, 708 F.2d 1241, 1251 (7th Cir. 1983) (upholding facial adequacy of access plan, but not foreclosing future challenge to plan as implemented).

7

typewriter.  Accordingly, I proceed to the merits of his petition without waiting for Dayutis to file a supplemental memorandum.[6]

## III.  <u>DISCUSSION</u>

Dayutis claims that the procedures the Board used to deprive him of his accumulated good time credits were impermissible ex post facto laws and did not comport with the requirements of procedural due process.  He also claims that the punishment the Board imposed violated the Fifth Amendment's Double Jeopardy Clause and the Eighth Amendment's prohibition on cruel and unusual punishment.  I begin with Dayutis' ex post facto claim.

### A.    <u>Ex Post Facto Law</u>

Dayutis alleges that the 1986 revision of the <u>Inmates'</u> <u>Manual</u> resulted in a "new organization of disciplinary rules and procedures previously in use", and that as applied to him, these

---

[6]Dayutis has not requested an evidentiary hearing on his petition, and I determine that a hearing is unnecessary.  For the purposes of this order, I accept the truth of Dayutis' allegations to the extent that they are not inconsistent with the documents he relies on to support his claims.  Based on these allegations, I have determined that, as a matter of law, Dayutis is not entitled to the relief he seeks.  Consequently, no point would be served by holding an evidentiary hearing.  <u>See</u> Rule 8, <u>Rules Governing Section 2254 Cases in United States District</u> <u>Courts</u> (West 1994).

newly organized rules and procedures constituted impermissible ex post facto laws.  In essence, he claims that, "but for [these] changes in administrative practices," he would not have been sanctioned "simultaneously" with loss of good time credits, punitive segregation and reclassification to a higher custody status.  These allegations fail to state a viable claim for relief.

The Supreme Court has recently reaffirmed that the "constitutional prohibition on ex post facto laws applies only to [retrospective] penal statutes which disadvantage the offender affected by them."  <u>Collins v. Youngblood</u>, 497 U.S. 37, 41 (1990).  Specifically, the Supreme Court held that a law is prohibited as ex post facto only if it "'[1] . . . punishes as a crime an act previously committed, which was innocent when done; . . . [2] makes more burdensome the punishment for a crime, after its commission, or . . . [3] deprives one charged with crime of any defense available according to law at the time when the act was committed . . . .'"  <u>Id.</u> at 42-43 (quoting <u>Beazell v. Ohio</u>, 269 U.S. 167, 169-70 (1925)) (brackets added); <u>id.</u> at 52.  Thus, even if, "in relation to the offence or its consequences, [post-offense legislation] alters the situation of a party to his disadvantage", <u>id.</u> at 46, 50 (quoting <u>Duncan v. Missouri</u>, 152

9

U.S. 377, 382-83 (1894)), or otherwise substantially changes a defendant's rights, these changes implicate the Ex Post Facto clause only if they affect the "definition of a crime, or a defense to a crime, or alter its punishment." Ewell v. Murray, 11 F.3d 482, 485 (4th Cir. 1993) (construing Collins).

The only ex post facto category even arguably applicable to Dayutis' claim is that prohibiting laws which "make more burdensome the punishment for a crime, after its commission."[7] Collins, however, indicates that, for the Ex Post Facto Clause to apply to changed prison regulations, the changes must not merely "disadvantage" Dayutis. See 497 U.S. at 50. Rather, to be ex post facto, changes in prison regulations must make "more burdensome" the punishment for the crime for which Dayutis was originally convicted. In other words, the clause prohibits prison officials from imposing new or amended regulations which are themselves "punitive conditions" of confinement, Weaver v. Graham, 450 U.S. 24, 32 (1981) (citing, as example, statute requiring solitary confinement prior to execution as ex post

---

[7]Dayutis does not claim that the alleged regulatory changes occurred after the incident involving Officer Woodall. I therefore do not address whether these changes are ex post facto in the sense that they impermissibly prohibited, or increased the punishment for, Dayutis' conduct after it occurred.

10

facto when applied to capital offender whose offense was committed prior to the statute's enactment), and from retroactively and detrimentally changing the original determinants of Dayutis' sentence.  See id. at 32-35 (statutory change in formula governing calculation of good time credits violated ex post facto clause because the change made minimum punishment for the inmate's crime more onerous).

Here, Dayutis essentially alleges that the "changes in administrative practice[s]" that have occurred since he committed his criminal offense have altered the original determinants of his sentence.  Since 1971, however, the statute governing loss of good time credits has essentially stated that

> any serious act of misconduct or insubordination, or persistent refusal to conform to prison regulations during his confinement shall subject the prisoner to the loss of all or any portion of such credits, at the discretion of the [prison's administration].

N.H. Rev. Stat. Ann. § 607:51-b(III)(a) (1971).  See N.H. Rev. Stat. Ann. § 651:55-b(III)(a) (1974) (recodified as amended at N.H. Rev. Stat. Ann. § 651-A:22(IV)(b) (1986)).  Thus, from the time he committed his offense in 1972, Dayutis has been subject to the loss of "any or all" of his accumulated good time credits for a "serious" disciplinary violation or a "persistent" refusal to conform to prison regulations.

11

Moreover, even if, as Dayutis claims, the prison changed its regulations implementing the above statute (i.e., defining and punishing "serious" misconduct and "persistent" disobedience), this regulatory change would not constitute an additional penalty for Dayutis' original criminal offense. Reasonable prison regulations governing inmate conduct, and subsequent punishment for infractions thereof, are matters which "every prisoner can anticipate are contemplated by his original sentence to prison." Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991) (en banc). Further, given that no inmate has a right to a specific set of regulations, the regulations applicable to a particular inmate are not frozen as of the time of his original criminal offense. Ewell, 11 F.3d at 485-86. Reasonable amendments thus also fall within every inmate's anticipated sentence. Jones v. Murray, 962 F.2d 302, 309-10 (4th Cir.), cert. denied, 113 S. Ct. 472 (1992); Ewell, 11 F.3d at 486-87. Consequently, prison administrators do not violate the Ex Post Facto clause by adopting, amending and enforcing reasonable regulations in response to the demands of good prison administration, safety and efficiency.[8] Jones, 962

---

[8]The Supreme Court's holding in Scafati v. Greenfield, 390 U.S. 713 (1968), aff'g. mem., 277 F. Supp. 644, 645 (D. Mass. 1967), is not to the contrary. In Scafati, the Supreme Court summarily affirmed a lower court decision preventing the

12

F.2d at 309.


B.   **Due Process**

Dayutis claims that he was not provided with adequate procedural due process before the Board found him guilty of a major disciplinary violation and sanctioned him with loss of forty days of accumulated good time credits.  As a matter of law, I hold that this claim fails to afford him a basis for relief.

Procedural due process questions are governed by a two-step analysis: first, I must determine whether the State has deprived Dayutis of a legitimate liberty or property interest, and second, I must determine whether "the procedures attendant upon [this] deprivation were constitutionally sufficient."  Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 460 (1989).  While the

retrospective application of a Massachusetts statute which required that an inmate returned to prison for parole violations be deprived of an automatic credit for presumed good behavior during the first six months after return to custody.  Scafati thus did not deal with prison regulations punishing an offender's misconduct during confinement, which all prison sentences contemplate, but with a statute that punished for misconduct occurring outside prison walls.  See In Re Ramirez, 705 P.2d 897, 902 (Cal. 1985), cert. denied, 476 U.S. 1152 (1986).  Moreover, to the extent that Scafati relied on the fact that the new statute altered the inmate's position "to his disadvantage," the decision may no longer be good law.  See Collins, 497 U.S. at 50.

Fourteenth Amendment itself confers no liberty interest in accumulated good time credits, see Wolff v. McDonnell, 418 U.S. 539, 557 (1974), the State concedes that such an interest is conferred by New Hampshire law.  See Kentucky Dept. of Corrections, 490 U.S. at 460 ("[p]rotected liberty interests 'may arise from two sources -- the Due Process Clause itself and the laws of the States") (quoting Hewitt v. Helms, 459 U.S. 460, 466 (1983)); Stone v. Hamel, No. 91-385-B, slip op. at 4-5 (D.N.H. Apr. 8, 1994) (New Hampshire law provides prison inmates with liberty interest in accumulated good time credits).[9]  The question thus becomes whether the procedures by which the State deprived Dayutis of his liberty interest in his accumulated good time credits were constitutionally adequate.

In Wolff v. McDonnell, the Supreme Court held that, where a prison disciplinary hearing may result in the loss of good time credits, the State must at minimum provide the prisoner with:

_____

[9]Dayutis also pegs his due process claims to N.H. Const. part I, arts. 2 & 15.  However, absent a New Hampshire Supreme Court decision establishing due process requirements that are both applicable to prison disciplinary proceedings and extend beyond those required under the Fourteenth Amendment, these state constitutional provisions do not themselves provide the necessary "substantive predicates" to create a protectable liberty interest.  See Kentucky Dept. of Corrections, 490 U.S. at 462-63.

> (1) advance written notice of the disciplinary charges;
> (2) an opportunity, when consistent with institutional
> safety and correctional goals, to call witnesses and
> present documentary evidence in his defense; and (3) a
> written statement by the factfinder of the evidence
> relied on and the reasons for the disciplinary action.

Superintendent, Mass. Correctional Inst. v. Hill, 472 U.S. 445, 454 (1985) (summarizing Wolff).  If these procedural prerequisites are satisfied, a disciplinary board's decision depriving the prisoner of such credits must be upheld if its "guilty" finding is supported by "any evidence in the record...."  Id. at 455-56.

The State has satisfied the Wolff-Hill requirements here in most respects.  First, Dayutis admits in his Petition that, five days before the major disciplinary hearing was scheduled to be held, the State provided him with written notice of the hearing date that listed the rules allegedly violated and indicated that the violations would be processed as a major disciplinary violation.  Dayutis thus was adequately informed of the charges against him and given sufficient time to marshal the facts and prepare his defense.  See Wolff, 418 U.S. at 564.

Second, in a written decision, the Board summarized the testimony presented by both sides, concluded that Dayutis was found guilty because he admitted using foul language when

15

referring to a prison staff member, and determined that his past disciplinary history warranted loss of forty days accumulated good time.[10] By adequately detailing the nature of the proceeding and the Board's reasoning in reaching its conclusion, the decision provided adequate protection against misuse in subsequent collateral proceedings (i.e., parole determinations) and an adequate basis for appellate review. See id. at 565.

_____

[10]Dayutis argues that the Board improperly relied on his past disciplinary history to sanction him with loss of good time credits. Essentially, he contends that the "history" on which the Board relied included minor disciplinary violations which, although adjudicated before the major disciplinary hearing was held, actually occurred after the conduct with which the major disciplinary hearing was concerned. This argument is meritless. While the relevant prison regulations do define the range of penalties from which a disciplinary board may select, see N.H. Dept. of Corrections Directive No. 2.5.25, Processing Spot, Disciplinary, Incident and Intelligence Reports §IV(G) (Jan. 20, 1988), the regulations do not similarly limit the factors that the Board may consider in making its selection(s). See generally id. Moreover, such forms of "prior" history are widely acknowledged to be legitimate sentencing considerations. See, e.g., United States Sentencing Commission, Guidelines Manual § 4A1.2, app. note. 1 (1993) ("prior sentence" includes "sentence imposed after commencement of the instant offense, but prior to sentencing on the instant offense ...."). Accordingly, I find that the Board did not abuse its discretion by including in Dayutis' disciplinary history those disciplinary violations adjudicated before the Board's November 7 determination but based on violations that occurred after the conduct to which the November 7 determination related. See Smith v. Massachusetts Dept. of Correction, 936 F.2d 1390, 1399 (1st Cir. 1991) (prison officials's discretionary actions subject to review for abuse).

16

Moreover, the substance of the Board's conclusion was supported by "some evidence" -- Dayutis' admission. See Hill, 472 U.S. at 455-56.

Third, the Board's written decision indicates that Dayutis was provided with, and availed himself of, the opportunity to present evidence in his defense. Dayutis testified on his own behalf and, according to a section of the decision entitled "List Witnesses Heard," called inmate Tim Robbins to corroborate his version of the events. Not surprisingly, Dayutis does not deny that the State provided him with an adequate opportunity to present his defense.

Dayutis does, however, take issue with the Board's denial of his attempts to cross-examine the reporting officer at the hearing.[11] In Wolff, the Supreme Court declined to hold that an inmate has a constitutional right to confront and cross-examine witnesses at a prison disciplinary hearing. 418 U.S. at 568-69. The court noted in dicta that

> [t]here may be a class of cases where the facts are
> closely disputed and the character of the parties

---

[11]Dayutis also contends that the State failed to comply with several of its own regulations governing disciplinary procedures. This claim is meritless. Dayutis' allegations contradict and/or misconstrue the disciplinary record referenced in his complaint or the applicable prison regulations.

17

> minimizes the dangers involved. However, any constitutional rule tailored to meet these situations would undoubtedly produce great litigation and attendant costs in a much wider range of cases. Further, in the last analysis, even within the narrow range of cases where interest balancing may well dictate cross-examination, courts will be faced with the assessment of prison officials as to the dangers involved, and there would be a limited basis for upsetting such judgments. The better course at this time ... is to leave these matters to the sound discretion of the officials of state prisons.

Id. at 569. In Smith, the First Circuit Court of Appeals construed the above-quoted language from Wolff, together with the Supreme Court's more recent decision in Ponte v. Real, 471 U.S. 491 (1985), to require in most instances that prison disciplinary boards justify the denial of an inmate's request to confront witnesses at prison disciplinary hearings. 936 F.2d at 1399-1400. But see Silva v. Casey, 992 F.2d 20, 22 (2d Cir. 1993) (per curiam) ("an inmate has no constitutional right of confrontation" at a disciplinary hearing).

In the present case, the record does not disclose the reason why the board declined Dayutis' request to cross-examine Officer Woodall. Nevertheless, in finding Dayutis guilty of a major disciplinary violation, the board stated that it had based its decision on Dayutis' admission that he had used foul language. Since the board did not rely on Officer Woodall's testimony in

18

reaching its decision, it was under no obligation to explain its refusal to allow Dayutis to cross-examine Woodall. See Smith, 936 F.2d at 1400 (Board did not have to explain limitation on cross-examination where excluded questions sought irrelevant information). Accordingly, Dayutis' due process claims are dismissed.

## C.   Double Jeopardy

Dayutis contends that the Board's imposition of multiple punishments -- punitive segregation and loss of good time credits -- for the same act of misconduct violates the Fifth Amendment's Double Jeopardy clause. This contention presents no cognizable claim for relief because the Double Jeopardy clause applies only to criminal or quasi-criminal proceedings. See Langton v. Berman, 667 F.2d 231, 233, 234 (1st Cir. 1981) (punishing prisoner with 15 days isolation and loss of all privileges, including good-time credits, did not violate Double Jeopardy clause). See also Breed v. Jones, 421 U.S. 519, 528 (1975) (Double Jeopardy clause does not apply to proceedings not "essentially criminal"); Wolff, 418 U.S. at 556 ("Prison disciplinary proceedings are not part of a criminal prosecution ...").

## D. Cruel and Unusual Punishment

Finally, Dayutis' reliance on the Eighth Amendment also fails to state a viable claim for relief. Dayutis argues that punishing his violation of Rules 12 and 14 with both punitive segregation and loss of good time credits constituted cruel and unusual punishment. However, only deprivations which deny the "'minimal civilized measure of life's necessities,'" Wilson v. Seiter, 111 S. Ct. 2321, 2324 (1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)), or are grossly disproportionate to the severity of the crime constitute cruel and unusual punishment. Harmelin v. Michigan, 111 S. Ct. 2680, 2705 (1991) (Kennedy, J., concurring); see also id. at 2686 (opinion of Scalia, J.). Punitive segregation and loss of accumulated good time credits, whether considered individually or in combination, do not deprive Dayutis of life's minimum necessities. Jackson v. Meachum, 699 F.2d 578, 581-83 (1st Cir. 1983) (segregation); Ervin v. Ciccone, 557 F.2d 1260, 1262 (8th Cir. 1977) (per curiam) (same); see generally Wolff, supra (good time-credits); Wilson, 111 S. Ct. at 2327 (combination of conditions do not result in Eight Amendment violation unless they together deprive inmate a particular necessity). Moreover, even if imposed together, they do not constitute a "grossly disproportionate" penalty. The

harshness of the penalty is rationally related to the severity of Dayutis' disciplinary violation, especially when considered in light of Dayutis' disciplinary history.  See Tart v. Massachusetts, 949 F.2d 490, 503-04 (1st Cir. 1991); Harmelin, 111 S. Ct. at 2706.

## III.  CONCLUSION

For the foregoing reasons, all claims set forth in Dayutis' amended petition for habeas corpus are dismissed.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

May  2, 1994

cc:  Nancy J. Smith, Esq.
     Dean Dayutis, pro se